**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| William E. Coe, | : | CIVIL ACTION |
|     Plaintiff, | : | |
|              v. | : | |
| | : | |
| U.S. Steel Corporation, | : | |
|     Defendant. | : | NO. 11-5500 |

## MEMORANDUM RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Baylson, J.                                                                                November 21, 2012

### I.      Introduction

Plaintiff William Coe ("Plaintiff"), an African American male, brought this action against

his employer, Defendant U.S. Steel Corporation ("Defendant"), alleging that Defendant

discriminated against him by denying him full-time work in violation of Title VII of the Civil

Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq.  Defendant moves for summary

judgment pursuant to Fed. R. Civ. P. 56(c) (the "Motion").  For the following reasons,

Defendant's Motion is GRANTED.

### II.     Summary of Undisputed Facts

The following facts are undisputed or reflect Plaintiff's version of facts in the record,

pursuant to this Court's duty to view all facts and inferences in the light most favorable to the

non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

Plaintiff is a long-time employee at Defendant's steel finishing plant in Fairless, PA (the

"Fairless Plant").  (Coe Dep. 15:9-11, 17:2-19, June 28, 2012, App'x 1 to Def.'s Mot.)  He is

currently, and was at all relevant times, a Maintenance Technician represented by the United

Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service

Workers International Union (the "International Union").  (Id. at 15:20-16:4, 17:9-19.)  He was

elected president of Local Union 4889 at the Fairless Plant (the "Local Union") in mid-2009. (Id. at 21:14-22:9.)

Defendant and the International Union have negotiated collective bargain agreements, known as the Basic Labor Agreements, that set forth and govern the various terms and conditions for production and maintenance employees at Defendant's facilities, including the Fairless Plant. (Show Dep. 12:13-23, May 22, 2012, App'x 2 to Def.'s Motion.)  Two Basic Labor Agreements are relevant to this case:  the Basic Labor Agreement that was in effect from mid-2003 until September 1, 2008 (the "Pre-September 2008 BLA" or "Previous BLA") and the one that came into effect on September 1, 2008 and is currently in effect (the "Post-September 2008 BLA" or "Current BLA").

Pursuant to both the Pre- and Post-September 2008 BLAs, presidents of the local unions at Defendant's facilities have the exclusive power to appoint union workers as representatives on a number of joint union-management committees.  (Coe Dep. 59:5-60:4; Show Dep. 18:21-20:16.)  One such representative is known as the Safety Representative.  The Safety Representative is partly responsible for handing safety issues, performing what is referred to as "safety work."   Safety work is what most people would consider white collar work:  it includes handling safety complaints from plant workers, investigating safety matters, chairing meetings, and deciding whether new safety equipment would be useful; the work is done from an office and involves a limited amount of work-related travel.  (Coe Dep. 25:21-26:2, 38:19-39:21; Bara Dep. 19:18-20:7, 21:18-22:3, June 29, 2012, App'x 3 to Def.'s Mot.)  Safety work does not, however, entitle the Safety Representative to any additional pay or benefits.  While the Safety Representative performs safety work in lieu of his or her usual assignment, he or she is

compensated as if he or she were performing his or her usual assignment.  (Show Dep. 19:14-20, 29:3-20.)

The governing Basic Labor Agreement determines the maximum number of hours for which the Safety Representative is supposed to perform safety work each week.  Under the Pre-September 2008 BLA, the Safety Representative for the Fairless Plant could perform safety work for a maximum of forty hours, i.e. the Safety Representative could perform safety work full-time. (Coe Dep. 50:19-51:10; Excerpt from the May 20, 2003 Agreement Between United States Steel Corporation and the United Steel Workers of America:  Production and Maintenance Employees, Ex .1 to the Show Dep., at US00265 (¶ 3.J.1).)  Under the Post-September 2008 BLA, the Safety Representative for the Fairless Plant is only supposed to perform sixteen hours of safety work per week, i.e. the position is part-time.  (Excerpt from the September 1, 2008 Agreement Between United States Steel Corporation and the United Steel Workers of America:  Production and Maintenance Employees, Ex .1 to the Show Dep., at US00267 (¶ AQ6.3).)

Plaintiff appointed himself Safety Representative for the Fairless Plant on August 28, 2009[1] by submitting a letter to Suzanne Show ("Show"), (Ltr. from W. Coe to S. Show, Ex. 4 to the Coe Dep. at USS00371) who is responsible for Employee Relations, including Labor Relations, for the Fairless Plant (Show Dep. 5:24-6:17, 7:17-8:25).  When Plaintiff submitted the letter to Show, Show informed him that he would only be allowed to work sixteen hours per week as Safety Representative.[2]  (Coe Dep. 101:19-102:14.)  Plaintiff believed that he was

_____

[1] The letter has three inconsistent dates on it:
1.   The date in the address area at the top of the letter is August 29, 2009;
2.   In the body of the letter, Plaintiff wrote "as of today August 30, 2009"; and
3.   The letter is stamped as being received by Show on August 28, 2009.
The exact date of the letter is immaterial to the Court's analysis.
[2] As discussed in Section IV.A.2., _infra_, the record is unclear regarding whether Plaintiff and Show had a prior conversation in mid-August about the Safety Representative's part-time schedule.

entitled to perform forty hours of safety work per week because Kathryn Bara ("Bara"), the white woman he was replacing, routinely had been allowed to perform safety work full time throughout her tenure as Safety Representative.[3]  (Id. at 99:6-100:17.)  Her tenure spanned a period during which both the Previous BLA (allowing forty hours of safety work) and Current BLA (allowing only sixteen hors of safety work) were in effect.  (Bara Dep. 48:14-17, 53:14-24.) Plaintiff testified that he did not know who was responsible for the decision to reduce the Safety Representative's schedule, though he believed that Show made the decision.  (Coe Dep. 90:11-20, 92:10-17.)

According to a declaration from Robert Ives ("Ives"), he was responsible for the decision to reduce the Safety Representative's schedule.  (Ives Decl. ¶ 14, App'x 6 (Revised)[4] to Def.'s Mot.)  Ives's declaration states that he was Area Manager for the Fairless Plant from June 1, 2009 until March 21, 2010, and his responsibilities included setting the daily schedules for union employees, including the Safety Representative.  (Id. ¶¶ 2-3.)  Ives's account of his decision-making process is:

> 1. That while reviewing the Current BLA in August 2009, he became aware of Appendix Q-6, which set the Fairless Plant Safety Representative's maximum hours at sixteen, as opposed to the forty hours for which the position was being scheduled at that time;

---

[3] Bara apparently worked in her usual assignment from time to time, but there is no dispute that she routinely performed safety work full time.  (Bara Dep. 48:18-20, 49:17-20.)  The exact amount of time Bara spent working in her usual assignment is immaterial to the Court's decision to grant Defendant's Motion.

[4] On September 27, 2009, the Court held oral argument on a number of issues.  At the hearing, the Court determined that declarations Defendant submitted from Ives and Show were deficient because they stated that the "statements herein are correct to the best of my personal knowledge or upon information and belief obtained after due inquiry," (Ives Decl. ¶ 15, App'x 5 to Def.'s Mot.; Show Decl. ¶ 25, App'x 4 to Def.'s Mot., (emphasis added)), which does not satisfy Fed. R. Civ. P. 56(c)(4)'s requirement that "declaration[s] used to support or oppose a motion must be made on personal knowledge."  The Court invited Defendant to remedy the deficiency, and Defendant filed revised declarations for both Ives and Show on October 4, 2012 (ECF No. 38).  All citations to Ives's and Show's declarations refer to these revised versions.

4

2.  He then conferred with his supervisor, Irvin Plant Manager Gene Hackey, and Employee Relations Manager Preston Henderson ("Henderson"); and

3.  He subsequently decided "on or about" August 24, 2009 to reduce the Safety Representative's schedule "solely" in order comply with Appendix Q-6 of the Current BLA.

(Id. ¶¶ 11-14.)  Neither Hackey nor Henderson was deposed, and neither of them submitted declarations.  Nothing in the record sheds further light on the content of their communications with Ives.

Sometime before Ives reduced the Safety Representative's schedule,[5] Plaintiff spoke to him about removing Bara as Safety Representative, but Plaintiff did not tell Ives that he intended to appoint himself as Bara's replacement.  (Coe Dep. 102:20-103:11.)

Ives's motivation for reducing the Safety Representative's schedule and the exact date on which he made his decision are hotly contested issues.  Ives was never deposed and there are no documents corroborating or contradicting Ives's declaration.  The only corroboration for Ives's account of his decision-making process is:

1.  Show's declaration, in which she avers that "[o]n or about August 24, 2009, Area Manager Robert Ives informed me that the Safety Representative would be scheduled for 16 hours a week, as stated in the [Current BLA]"; and

2.  Show's deposition testimony that that the decision was discussed in mid-August and was expected to take effect on August 23, 2009.

---

[5] The record is unclear regarding the exact date of Plaintiff's conversation with Ives.  During Plaintiff's deposition, he was asked to give the timing of this conversation relative to a conversation he may have had with Show in mid-August.  (Coe Dep. 91:11-17.)  (As mentioned in note two, supra, the record is unclear as to whether Plaintiff's mid-August conversation with Show actually took place.)  Plaintiff testified both that his conversation with Ives took place before August 2009 and approximately a day after his mid-August conversation with Show.  (Id. at 89:21-90:1, 91:19-92:4.)  Regardless, treating Plaintiff's conversation with Ives as taking place before Ives's August 24, 2009 decision is consistent with Plaintiff's testimony.  The date of Plaintiff's conversation with Ives is otherwise immaterial.

(Show Decl. ¶ 12, App'x 6 (Revised) to Defendant's Motion; Show Dep. 52:9-24.)

Plaintiff held the Safety Representative position for approximately a week before he stepped down and reappointed Bara, at the request of the International Union.  (Coe Dep. 104:6-11, 111:20-114:1; Ltr. from W. Coe to S. Show, Sept. 3, 2009, Ex. 4 to the Coe Dep. at USS00372.)  Bara was only allowed to perform sixteen hours of safety work per week after returning to the position.[6]  (Coe Dep. 123:22-124:5, 126:2-7; Bara Dep. 59:23-60:8.)  Bara was eventually replaced as Safety Representative by a white man who also has been limited to only sixteen hours of safety work per week.  (Coe Dep. 125:8-126:12; Show Decl. ¶ 22.)

After reappointing Bara as Safety Representative, Plaintiff pursued a grievance against Defendant according to the procedures in the Current BLA, claiming that he should have been allowed to work forty hours per week as Safety Representative and seeking $500,000.  (United Steel Workers Civil & Human Rights Complaint Form, Oct. 2, 2009, Ex. 6 to the Coe Dep.)  The grievance process ended with Plaintiff's claim being denied.  (Ex. 7 to the Coe Dep. (including various documents generated during the grievance process).)  Plaintiff then filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC").  (Ex. 8 to the Coe Dep. (including various documents generated during the EEOC process).)  The EEOC found that Plaintiff had failed to establish that Defendant discriminated against him.  (Id.)  Plaintiff subsequently filed this case.

---

[6] Bara "was absent from the Fairless Plant, due to a non-occupational disability illness, from September 4, 2009 through December 2, 2009."  (Joint Stipulation of the Parties, October 25, 2012 (ECF No. 43).)

## II.      Summary of the Parties' Dispute[7]

This case orbits around the timing of Defendant enforcing Appendix Q-6 of the Current BLA, which reduced the Fairless Plant Safety Representative's schedule to sixteen hours, down from the forty hours allowed under the Previous BLA.  In short, it is undisputed that despite the Current BLA being effective as of September 2008, Defendant did not enforce Appendix Q-6's schedule reduction until late August 2009, which coincided with Plaintiff, an African American, appointing himself as Fairless Plant Safety Representative, replacing Bara, a white woman. Plaintiff alleges that Defendant finally enforced Appendix Q-6's schedule reduction in order to discriminate against him because of his race.

Defendant counters by asserting that:

1.  Ives was responsible for the decision to enforce Appendix Q-6 and reduce the Safety Representative's schedule, and

2.  Plaintiff cannot prove a discriminatory motive for Ives's decision, because Ives was unaware of Plaintiff's intent to appoint himself Safety Representative when he made his decision.

Plaintiff retorts that Defendant's position is entirely unbelievable, and that the only reasonable conclusion to draw from the circumstances surrounding the delayed enforcement of Appendix Q-6 is that it was motivated by racial animus.  The crux of Plaintiff's position is his assertions that:

1.  Defendant has offered no plausible explanation for the almost year-long delay in enforcing Appendix Q-6;

---

[7] The parties' submissions contain considerable back and forth on issues related to whether Plaintiff established a prime facie case of discrimination as required by the McDonnell Douglas-Burdine-Hicks line of cases. As discussed in Section IV.A., infra, facts material to these issues are genuinely in dispute, and, therefore, Defendant is not entitled to summary judgment on this ground.  Accordingly, the Court does not provide a detailed summary of the parties' positions on these issues.

2. Defendant proffered no documentary evidence to corroborate Ives's account of his decision-making process; and

3. Because a pervasive atmosphere of racial animus plagues the Fairless Plant, any doubt about the reason for finally enforcing Appendix Q-6 should be resolved in favor of a finding of racial discrimination.

## III.    Legal Standard

### A.    Summary Judgment

A district court should grant a motion for summary judgment if the movant can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law."  Id.

Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by showing the district court that "there is an absence of evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  The party opposing summary judgment must rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Id. at 322.  The district court may grant summary judgment "[i]f the evidence is merely colorable, or is not significantly probative."  Anderson, 477 U.S. at 249 (citations omitted).  Under Rule 56, the Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in favor of the non-movant.  Id. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)).

### B.      Title VII

It is unlawful employment practice for an employer "to fail or refuse to hire or to

discharge any individual, or otherwise to discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such individual's race,

color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  To prevail on a claim of

disparate treatment, the plaintiff must demonstrate purposeful discrimination.  Patterson v.

McLean Credit Union, 491 U.S. 164 (1989); Weldon v. Kraft, Inc., 896 F.2d 793, 796 (3d Cir.

1990).

Absent direct evidence, the plaintiff may prove intent through the familiar framework

established in the McDonnell Douglas-Burdine-Hicks line of cases.  St. Mary's Honor Ctr. v.

Hicks, 509 U.S. 502 (1993).  First, the Plaintiff must show by a preponderance of the evidence

that a prima facie case of unlawful discrimination exists.  Hicks, 509 U.S. at 506; Fuentes v.

Perskie, 32 F.3d 759, 763 (3d Cir. 1994).  To establish a prima facie case, a plaintiff must

initially introduce evidence showing that:

   1.  He is a member of a protected class,

   2.  He was qualified for the position at issue,

   3.  He suffered an adverse employment action, and

   4.  That the circumstances surrounding the adverse action give rise to
       an inference of unlawful discrimination.

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  Plaintiff's burden at the prima

facie stage is not meant to be onerous.  Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248,

253 (1981); Simpson v. Kay Jewelers, Inc., 142 F.3d 639, 646 (3d Cir. 1988).

Second, once a plaintiff establishes a prima facie case, the employer must produce

9

evidence showing that a legitimate nondiscriminatory reason can account for its action.  Fuentes, 32 F.3d at 763.  However, even if the employer produces such evidence, the plaintiff can still survive a summary judgment motion if he produces "sufficient evidence to raise a genuine issue of fact as to whether the employer's proffered reasons were not its true reasons for the challenged employment action."  Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1067 (3d Cir. 1996); see also Hicks, 509 U.S. at 511 ("rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination" (emphasis in original)).  The plaintiff can meet this burden by "present[ing] evidence contradicting the core facts put forward by the employer as the legitimate reason for its decision," Tomasso v. Boeing Co., 445 F.3d 702, 706 (3d Cir. 2006) (emphasis in the original) (quotation omitted), thereby "demonstrat[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence."  Fuentes, 32 F.3d at 765 (emphasis in the original) (quotation omitted).  Although the burden of production shifts throughout this process, the ultimate burden of persuading the trier of fact always remains with the plaintiff.  Burdine, 450 U.S. at 253.

**IV.   Discussion**

There is no direct evidence that Defendant discriminated against Plaintiff.  For the reasons below, the Court finds that a reasonable jury could conclude that Plaintiff established a prima facie case of discrimination.  Nevertheless, the Court grants Defendant's Motion because Defendant proffered a legitimate, non-discriminatory reason for reducing the Safety Representative's schedule, compliance with the sixteen-hour maximum set forth in Appendix Q-

6 of the Current BLA, and Plaintiff has failed to establish that this reason is merely a pretext for discrimination.

### A.     Plaintiff's Prima Facie Case

The parties do not dispute that Plaintiff, an African American, is a member of a protected class.  Nor do they dispute that Plaintiff is qualified to be the Fairless Plant Safety Representative (as discussed above, Plaintiff had plenary power over whether he held the position). Accordingly, the Court moves directly to consideration of whether Plaintiff suffered an adverse employment action and whether the circumstances surrounding that action give rise to an inference of discrimination.  A reasonable jury could find for Plaintiff on both issues,[8] and, therefore, the Court cannot grant summary judgment based on Plaintiff's failure to establish a prima facie case of discrimination.

### 1.     Adverse Employment Action

According to Defendant, Plaintiff could not have suffered an adverse employment because:

1. Plaintiff, not Defendant, was solely responsible for appointing himself to, and removing himself from, the Safety Representative position; and

2. Plaintiff's work hours, pay, and benefits remained the same regardless of whether he was working as Safety Representative or in his usual position at the Fairless Plant.

Plaintiff does not dispute these contentions.  Rather, Plaintiff argues that there is such an objective, substantive disparity between safety work and the steel production work he usually

---

[8] The Court has not determined that Plaintiff established a prima facie case as a matter of law.

performs, that not being able to perform safety work full-time amounts to an adverse employment action.

A reasonable jury could conclude that Plaintiff suffered an adverse employment action by not being allowed to perform safety work full-time. It is undisputed that the Safety Representative performs, for the most part, white-collar work, and that in his usual mechanic position, Plaintiff performs blue-collar work on the floor of a steel production plant. As the Seventh Circuit stated in O'Neal v. City of Chicago, while "a purely subjective preference for one position over another" is insufficient to "justify trundling out the heavy artillery of federal antidiscrimination law," being placed in a position that is "objectively inferior to [a] previous job[]" may amount to an adverse employment action. 392 F.3d 909, 913 (7th Cir. 2004) (citation and quotation omitted). And when it comes to working conditions:

> Few workers in today's job market would choose to give up access to computers so they could spend the winter on trenchers and with shovels, digging holes that made way for other workers to complete the skilled part of the labor. This preference is not idiosyncratic; it is universal.

Id. (citation and quotation omitted).

## 2.   Inference of Discriminatory Intent

The parties hotly contest whether Plaintiff can establish that the circumstances surrounding Defendant's enforcement of Appendix Q-6 give rise to an inference of discrimination. Plaintiff argues that Defendant could have enforced Appendix Q-6 at any time between September 2008 and August 28, 2009 – during a white woman's tenure as Safety Representative – and has not coherently explained its failure to do so. In particular, Plaintiff points out that people in management positions for the Fairless Plant had discussed the Safety

Representative's reduced schedule under Appendix Q-6 with Plaintiff's white predecessor, but, for some unknown reason, never took action on it. Against this background, Plaintiff argues that the coincidence of enforcing Appendix Q-6 with an African American taking over the position from a white person is sufficiently suspicious to give rise to an inference of discrimination.

Defendant counters that Ives, the person who finally enforced Appendix Q-6, did not know that Plaintiff was going to take over as Safety Representative and, therefore, could not have discriminated against him. Ives, the new Area Manager for Fairless Plant, arrived in June 2009 and decided to enforce Appendix Q-6 on or about August 24, 2009, after reviewing the Current BLA sometime in August 2009 and realizing that the Safety Representative was being improperly scheduled for too many hours. (Ives Decl. ¶¶ 2, 11-12, 14; Show Decl. ¶ 12.) According to Defendant, however suspicious the timing of Ives's decision may initially appear, it is entirely benign when seen in this context.

The record is replete with contradictory information relevant to an inference of discriminatory intent; the only clear conclusion is that a reasonable jury could find that the circumstances surrounding the enforcement of Appendix Q-6 are sufficiently suspicious to support an inference of discrimination.

First, the record is unclear as to precisely when Plaintiff first revealed his intent to take over as Safety Representative. Plaintiff's own testimony is contradictory: he testified both that he spoke about it to Show in mid-August, (Coe Dep. 66:1-13,[9] 98:12-99:2) but also that he did not tell Show until August 28, when he gave her a letter formalizing his appointment (Id. at

---

[9]"A: Well, I went and talked to [Show] and I said, I'm thinking I'm going to remove [Bara] from safety. And she said, well who are you going to put there? And I said, myself. / Q: This Discussion occurred where? / A: In her office. / Q: And it would have been sometime within the month of August 2009? / A: Yes. / Q: You are

152:14-19, 153:10-15[10], 154:12-16[11]).  The latter version of events is corroborated by Plaintiff's

Civil & Human Rights Complaint, which he submitted to the union as part of the grievance

process under the Current BLA:

> I gave the Labor Relation Manager[, Show,] a formal letter notifying her I was removing the Safety Rep. which was a white female, replacing her with myself, a black male.
>
> When I gave the Company the letter . . . the Company informed me at that time the position was created for THAT specific person only!  If I took the position it would only be 16 hours per week, not the 40 hours it was.

(Id. Ex. 6.)

Show testified that she did not learn of Plaintiff's intent to appoint himself as Safety

Representative until August 28, 2009, when Plaintiff gave her the letter formalizing his

appointment.  (Show Dep. 54:16-23.)  Bara testified that Plaintiff may have informed her of his

intent to replace her as Safety Representative as early as April or May 2009.  (Bara Dep. 9:18-

10:7.)  However, nothing in the record indicates whether Bara communicated Plaintiff's intent to

anyone else.

Second, the record is unclear as to exactly when Ives made the decision to enforce

Appendix Q-6.  Defendant submitted declarations from Ives and Show asserting that Ives made

his decision on or about August 24.  (Ives Decl. ¶ 14; Show Decl. ¶ 12.)  Show testified that the

decision was discussed in mid-August and that it was intended to take effect on August 23.

---

saying approximately two weeks before August 28th, 2009? / A:  I'm guessing two weeks before."

[10]"Q:  [I]s it fair to say that you did not have any conversations with Susanna Show before August 28, 2009, related to the removal of Kathy Bara as the safety representative? / A:  I didn't have it with her. . . . / Q:  [D]o you agree that the first conversation you ever had with Susanna Show about removing Kathy Bara as safety representative occurred on August 28th, 2009? / A:  Yes."

[11]"Q:  You are mistaken, I'm assuming, in believing that there was some earlier conversation with Susanna Show that took place before August 28, 2009? / A:  Yes."

(Show Dep. 52:9-24.)  Plaintiff testified that Show told him in mid-August that the Safety

Representative's hours were going to be reduced, (Coe Dep. 88:15-89:7), but, as noted above,

the record is unclear as to whether Plaintiff's mid-August conversation with Show actually took

place.  Ives was never deposed.

Importantly, had Ives made his decision on or before August 24, it would have affected

Bara, Plaintiff's white predecessor.  However, Defendant admits to never having informed Bara

of Ives's decision before Plaintiff formally replaced her as Safety Representative, because she

was traveling for work and then on vacation.  According to Show and Ives, they planned to

inform her of the schedule reduction when she returned to work.  (Ives Decl. ¶ 15; Show Dep.

52:15-24.)

Plaintiff asserts that the decision could not have been made on or before August 24,

because Defendant's usual practice is to inform him of this type of decision by email.  As

president of the Local Union, Plaintiff claims that Defendant informs him of decisions affecting

joint union-management committees.  (Coe Dep. 93:17-94:19.)  There is nothing in the record to

corroborate either parties' assertions regarding the timing of Ives's decision.  In particular,

Plaintiff has produced no emails of the type he claims he normally receives from Defendant, and

Defendant has produced no document corroborating its account of when Ives made his decision.

Plaintiff also disputes the veracity of Ives's claim that he did not know that the Safety

Representative was improperly scheduled until August of 2009, asserting that such ignorance is

implausible based on other evidence in the record.  Bara testified that Fairless Plant management

– Employee Relations Manager Henderson, Ives's predecessor, and Show – knew about

Appendix Q-6's sixteen-hour schedule and discussed it with her long before Ives enforced it.

(Bara Dep. 13:18-15:12, 33:21-34:6.)  Ives stated in his declaration that he conferred with

Henderson before enforcing Appendix Q-6.  (Ives Decl. ¶ 13.)  Furthermore, nothing in the

record sheds light on:

1. The reason for the delay in enforcing Appendix Q-6;

2. Why Ives happened to be reviewing the Current BLA in August
   2009, which was nearly two months after he took over as Area
   Manager for the Fairless Plant; and

3. What caused Ives to notice Appendix Q-6 during this review.

The Current BLA consists of at least 227 pages, covering everything from "Union Security" to

"Union Vacation Pay Calculation."  (Table of Contents for the Current BLA, Ex. A to the Show

Dep. at USS00393-99.)  While, Ives's job responsibilities include daily scheduling for union

employees, that does not by itself explain why Ives was reviewing the Current BLA in August

2009 and would have noticed that the Safety Representative's schedule was incorrect during this

review.

In light of the foregoing, Plaintiff has clearly raised fact issues – largely attacks on the

credibility of Ives and Show – that cannot be resolved on a motion for summary judgment.

Moreover, the facts at issue – when Ives was aware of Plaintiff's intent to take over as Safety

Representative and when Ives made the decision to reduce the schedule – lie at the heart of any

inference of discriminatory intent.  Plaintiff has evidence to allow an inference of discrimination,

i.e. a prima facie case of discrimination.

**B.    Defendant's Legitimate Non-Discriminatory Reason**

Defendant correctly argues that enforcing the terms of Appendix Q-6 is a legitimate, non-

discriminatory reason for reducing the Safety Representative's schedule.  Defendant submitted

16

declarations from Ives and Show stating that:

1. Ives was the person responsible for the decision to enforce Appendix Q-6 and reduce the Safety Representative's schedule; and

2. His decision was made

   a. "[B]ased solely on Appendix Q-6 of the [Current] BLA,"

   b. On or about August 24, 2009, after reviewing the Current BLA in August 2009 and realizing that the Safety Representative's schedule did not comply with its terms, and

   c. Before he knew that Plaintiff was going to take over as Safety Representative.

(Ives Decl. ¶¶ 5, 11-12, 14, 16; Show Decl. ¶ 12.)  The declarations are consistent with Show's testimony that the decision was made "approximately August 23rd" and "discussed the week before that."  (Show Dep. 52:9-24.)  This is sufficient evidence to shift the burden back to Plaintiff to show that Defendant's proffered legitimate, non-discriminatory reason for reducing the Safety Representative's schedule is a pretext for discrimination.

> **1.    Plaintiff's Account of Why Defendant's Proffered Non-Discriminatory Reasons Are Implausible and a Pretext for Discrimination**

Plaintiff argues that Defendant's reasons are a mere pretext for discrimination, because Ives's account of his decision making process is entirely implausible in light of the totality of the circumstances surrounding his decision.

The Court held oral argument on Defendant's Motion on September 27, 2012.  At the argument, the Court requested that Plaintiff supplement his Response to Defendant's Motion with a list of evidence already in the record that supports his pretext argument.  Plaintiff

submitted his Supplemental Citation of Facts Showing Pretext (the "Pretext Supplement") on October 11, 2011, and Defendant responded on October 18, 2012.  Review of Plaintiff's initial Response to Defendant's Motion, in conjunction with his Pretext Supplement, reveals that his pretext argument has three main prongs, and is largely a rehash of his argument for an inference of discriminatory intent:

1. Defendant has not adequately accounted for the almost year-long delay in enforcing Appendix Q-6's sixteen-hour schedule for the Safety Representative, justifying suspicion that the motivation for its finally being enforced was discrimination against Plaintiff because of his race.

   a. According to Bara's deposition testimony, the sixteen-hour schedule was discussed among her and various people in management positions covering the Fairless Plant, including Show and Henderson, long before it was enforced.  (Bara Dep. 13:18-15:12, 33:21-34:6.)

   b. Show gave testimony inconsistent with Bara's, specifically, that the delay was a result of Fairless Plant management failing to notice Appendix Q-6.  (Show Dep. 57:15-22.)

2. Defendant's assertion that Ives decided to enforce Appendix Q-6 and reduce the Safety Representative's schedule before he knew that Plaintiff was going to take over the position is unbelievable and lacks corroboration.

   a. Defendant failed to adequately explain

      i. Ives's motivation for reviewing the Current BLA in August 2009, and

      ii. What caused Ives to notice Appendix Q-6;

   b. Defendant produced no records to support Ives's account of his decision-making process; and

   c. Defendant would normally inform Plaintiff of this kind of decision by email, but sent no such notification (Coe Dep. 93:17-95:11).

3.   Fairless Plant suffers from a pervasive atmosphere of racial discrimination, which strongly suggests that the real motivation for Ives finally enforcing Appendix Q-6 was discrimination against Plaintiff because of his race.

**2.   Plaintiff Has Failed to Proffer Sufficient Evidence to Support His Pretext Argument.**

As discussed above, Defendant has submitted declarations from Ives and Show to support its position that Ives made the decision to reduce the Safety Representative's schedule on or about August 24, 2009, solely in order to comply with the terms of Appendix Q-6 of the Current BLA, and before Ives was aware that Plaintiff was going to appoint himself Safety Representative.  (Ives Decl. ¶¶ 11-12, 14, 16; Show Decl. ¶ 12.)

Plaintiff has not pointed to any evidence that creates a genuine dispute of fact regarding Ives's and Show's declarations.  In fact, as noted above, the declarations are consistent with Show's deposition testimony about the timing of the decision.  Furthermore, there is nothing inherently unbelievable about Ives's story that as a new manager for the Fairless Plant, whose job responsibilities included creating daily schedules for union employees, he would have reviewed the Current BLA and discovered a scheduling error that his predecessor had failed (or neglected) to correct.  While Plaintiff's account of the facts might cast a shadow of suspicion over Ives's predecessor's failure to comply with the Current BLA, Plaintiff has proffered no evidence suggesting that Ives should be subject to the same suspicions that may be appropriately directed at his predecessor.[12]  Of course, Plaintiff "need only point to evidence from which a

---

[12] Ives's declaration states that he conferred with Henderson, one of the people spoke with Bara about the Safety Representative's schedule reduction under the Current BLA before Ives became Area Manager for the Fairless Plant, but Ives states that did so only _after_ discovering that Appendix Q-6 had never been enforced.  (Ives Decl. ¶¶ 12-13.)

19

fact-finder . . . might reasonably disbelieve [Defendant's] articulated legitimate reason," <u>Andes v. New Jersey City Univ.</u>, 419 F. App'x 230, 233 (3d Cir. 2011) (citing <u>Fuentes</u>, 32 F.3d at 764), but Plaintiff cannot defeat Defendant's motion with bare allegations that Ives's account should not be believed.  <u>Tomasso</u>, 445 F.3d at 706 (the plaintiff must "<u>present evidence</u> contradicting the <u>core facts</u> put forward by the employer as the legitimate reason for its decision" (second emphasis in original)); <u>Shibley v. Genesis Health Care</u>, Civil Action No. 09-3386, 2010 WL 3222162, at *2 (E.D. Pa. Aug. 12, 2010) (Baylson, J.), <u>aff'd</u>, 445 F. App'x 519 (3d Cir. 2011); <u>Waris v. HCR Manor Care</u>, Civil Action No. 07–3344, 2009 WL 330990, at *1 n.2 (E.D. Pa. Feb. 10, 2009) (Baylson, J.) (assertions that a movant's "evidence lacks credibility" are insufficient where they are "not supported by any factual allegations or affirmative evidence . . . . A party opposing summary judgment must do more than just 'rest upon mere allegations, general denials, or . . . vague statements.'"  (quoting <u>Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co.</u>, 311 F.3d 226, 233 (3d Cir. 2002) (omission in original))), <u>aff'd</u>, 365 F. App'x 402 (3d Cir. 2010).

Furthermore, Plaintiff's accusations that the Fairless Plant is pervaded by racial animus, and that he has faced retaliation for being the first African American Local Union President for the Fairless Plant and for filing a discrimination complaint are wholly without factual support. The only support Plaintiff can muster for these allegations is a raw tally of the number of minorities that have been terminated since he became president, and his own subjective beliefs and those of Kevin Naylor ("Naylor").[13]  Neither is sufficient, alone or in combination, to give

---

[13] Review of Naylor's deposition testimony reveals that his beliefs are entirely unsupported.  For example, Naylor admits to basing his beliefs about an allegedly discriminatory incident on "[s]cuttlebutt" around the Fairless Plant.  (Naylor Dep. 66:20-68:9, June 29, 2012, Ex. C to Pl.'s Repl.)

his accusations any credence.  <u>Cameron v. Infoconsulting Int'l, LLC</u>, Civil Action No. 04-4365,

2006 WL 1450842, at *10-11 (E.D. Pa. May 23, 2006) (O'Neill, J.) ("'statistical evidence' [i]s

not probative [where the] plaintiff's '[r]aw numerical comparisons'" are "'not accompanied by

any analysis of either the qualified applicant pool or the flow of qualified candidates over a

relevant time period'" (quoting <u>Ezold v. Wolf, Block, Schorr & Solis-Cohen</u>, 983 F.2d 509, 542-

43 (3d Cir.1992), <u>abrogated, in part, on other grounds</u>, <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S.

502 (1993)); even less persuasive is the plaintiff who "do[es] not even go so far as to offer 'raw

number comparisons,' but [instead] offer[s] a belief on subjective observations" because

"personal beliefs, conjecture and speculation are insufficient to support an inference" of

discrimination; "'[i]f [the plaintiff] wanted to introduce true statistical evidence, he could have

obtained the company records in the course of discovery'" (quoting <u>Chappell v. GTE Prods.</u>

<u>Corp.</u>, 803 F.2d 261, 268 (6th Cir. 1986))); <u>Mlynczak v. Bodman</u>, 442 F.3d 1050, 1058 (7th Cir.

2006) ("[I]f the subjective beliefs of plaintiffs in employment discrimination cases could, by

themselves, create genuine issues of material fact, then virtually all defense motions for

summary judgment in such cases would be doomed." (quotation omitted)).

      Finally, even if the Court were to find that because of the sparse documentary record,

Defendant cannot dispel every doubt surrounding Ives's motive for enforcing Appendix Q-6,

doubts are insufficient to defeat a motion for summary judgment.  As this Court has previously

recognized, Defendant is still entitled to summary judgment if Plaintiff "'created only a weak

issue of fact as to whether [Defendant's] reason was untrue and there was abundant and

uncontroverted independent evidence that no discrimination had occurred.'" <u>Andy v. United</u>

Parcel Service, No. Civ.A. 02-8231, 2003 WL 22697194, at *7-9 (E.D. Pa. Oct. 24, 2003)

(Baylson, J.) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000)),

aff'd, 111 F. App'x 670 (3d Cir. 2004).  As discussed above:

> 1.  Ives's account of his decision-making process is entirely plausible and consistent with Show's testimony on the timing of his decision; and
>
> 2.  Plaintiff's case is entirely inferential, but insufficient.

Accordingly, even if the Court were to find that Plaintiff's entirely inferential case created an issue of fact regarding Ives's decision-making process, that issue would be weak, at best, and could not defeat Defendant's Motion because the only direct evidence in the record supports Ives's account.

Plaintiff has failed to point to any evidence contradicting or plausible reason to disbelieve Ives's assertions that he reduced the Safety Representative's schedule simply in order to comply with Appendix Q-6 and before he knew about Plaintiff's intent to take over the position. Therefore, Plaintiff failed to carry his burden of showing that Defendant's proffered legitimate, non-discriminatory reason for reducing the Safety Representative's schedule is pretextual.

## V.     Conclusions

Defendant is entitled to summary judgment.  An appropriate order follows.

O:\CIVIL 11\11-5500 Coe v. U.S. Steel\11cv5500.Memo re Mot. SJ.doc